**LAUKAITIS LAW FIRM LLC**
Kevin Laukaitis (NJ Bar # 155742022)
737 Bainbridge Street #155
Philadelphia, PA 19147
Phone: (215) 789-4462
Email: klaukaitis@laukaitislaw.com

**-and-**

**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
Gary M. Klinger (pro hac vice forthcoming)
227 W. Monroe Street,
Suite 2100
Chicago, IL 60606
Phone: (866) 252-0878
Email: gklinger@milberg.com

*Attorneys for Plaintiff
and the Proposed Class*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ROBERT ELDER, individually on behalf of himself and on behalf of all others similarly situated, | |
| Plaintiff, | Civil Action No. _____ |
| v. | **CLASS ACTION COMPLAINT** |
| VALLEY HEALTH SYSTEM, INC. d/b/a THE VALLEY HOSPITAL, INC., VALLEY HOME CARE, INC., VALLEY MEDICAL GROUP, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

Plaintiff Robert Elder ("Plaintiff"), individually and on behalf of all other persons of the United States similarly situated ("Class Members"), brings suit against Defendants Valley Health System, Inc. d/b/a The Valley Hospital, Inc., Valley Home Care, Inc., and Valley Medical Group  ("Valley Health" or "Defendants"), and upon personal knowledge as to Plaintiff's own conduct and on information and belief as to all other matters based upon investigation by counsel, alleges as follows:

## INTRODUCTION

1.      This case arises from Defendants' systematic violation of the medical privacy rights of its patients, exposing highly sensitive personal information to third parties without those patients' knowledge or consent.

2.      Defendants maintain a website, www.valleyhealth.com, which allows patients of Valley Health System, Inc., Valley Home Care, Inc, and Valley Medical Group to access Defendants' digital platforms and communicate with their healthcare providers.

3.      Defendants assure visitors to the website that "[w]e understand that information about you and your health is personal" and that "[w]e are committed to protecting such information about you."[1]  Indeed, Defendants promise that they will never use or disclose "your protected health information for marketing purposes" without "your written permission."[2] Contrary to these assurances, however, Defendants have followed neither these policies nor the laws prohibiting disclosures of personal identifying information ("PII") or protected health information ("PHI") (collectively "Private Information").

---

[1] https://www.valleyhealth.com/notice-privacy-practices
[2] https://www.valleyhealth.com/notice-privacy-practices

4.      As recently as September 21, 2022, Defendants disclosed information about their patients—including their status as patients, their physicians, their medical treatments, the hospitals they visited, and their personal identities—to Facebook and other third parties without its patients' knowledge, authorization, or consent.

5.      Defendants disclosed this Private Information by embedding various digital marketing and automatic rerouting tools on its website that purposefully and intentionally send its patients' Private Information to third parties who exploit that information for advertising purposes.  Defendants' use of these tracking tools caused Plaintiff's and Class Members' Private Information and the contents of their communications with their healthcare providers to be automatically sent to third parties in violation of those patients' reasonable expectations of privacy, their rights as patients, their rights as citizens of New Jersey and the United States, and both the express and implied promises of Defendants.

6.      Defendants' conduct in disclosing such protected health information about its patients to Facebook and other third parties without notice or consent violates both Federal and New Jersey law, including N.J.S.A. 2A:156A-3 (Wiretapping), N.J.S.A. 26:2H-12.8(f) & (g) (Right to Privacy  and Confidentiality of Medical Records), the Electronic Communications Privacy Act ("ECPA",), 18 U.S.C. Sec. 2510, *et seq*, as well as other privacy rights and the fiduciary duty of confidentiality owed by hospitals and physicians to their patients first recognized in *Stempler v. Speidell*, 100 N.J. 368, 375 (1985).

7.      The Health Insurance Portability and Accountability Act of 1996 ("HIPAA") Pub. L. No. 104-191, 110 Stat. 1936 (1996), and the implementing regulations of the United States Department of Health and Human Services ("HHS") establish a national standard to protect patient health care information, medical records and other individually identifiable

information.

8.      The Department of Health and Human Services provides guidance for healthcare providers that patient status alone is protected by HIPAA.

9.      In response to the use of online tracking tools by HIPAA-covered entities like Defendants, HHS has also issued a publication concerning the *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (the "Bulletin").[3] As HHS warns in the Bulletin, "[w]hile it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI **only** as expressly permitted or required by the HIPAA Privacy Rule."

10.     Accordingly, patients of Valley Health have a reasonable expectation of privacy that the content of their communications with Valley Health will not be intercepted, transmitted, re-directed, or disclosed to third parties without their knowledge and/or consent.

11.     On behalf of himself and all others similarly situated, Plaintiff seeks an order enjoining Defendants from further unauthorized disclosures of his personal information; and granting an award of monetary relief, attorney's fees and costs; and granting any other preliminary or equitable relief the Court deems appropriate.

## PARTIES

12.     Defendants Valley Health System, Inc. d/b/a/ The Valley Hospital, Inc., Valley Home Care, Inc., and Valley Medical Group  ("Valley Health" or "Defendants") are non-profit entities that operate a general acute care hospital and ancillary medical services,

---

[3] https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index html.

licensed by the State of New Jersey, with their headquarters and principal place of business at 223 North Van Dien Avenue, Ridgewood, New Jersey 07450. Defendants own and manage numerous health facilities in New Jersey, including the Valley Hospital and other outpatient services.[4]

13.    Plaintiff, Robert Elder, is a New Jersey citizen and resident who resides in Bergen County, New Jersey, has been treated by Valley Health's physicians, and has been a patient at Valley Hospital, and thus also a patient of Defendants.

## JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act because (1) there are more than 100 putative Class Members, (2) the aggregate about in controversy, exclusive of costs and interest, exceeds $5,000,000.00, and (3) there is minimal diversity of citizenship because many members of the putative class are citizens of different states.

15.    This Court also has jurisdiction under 28 U.S.C. Sec. 1331 over claims that arise under the Electronic Communications Privacy Act, 18 U.S.C. Sec. 2510, *et seq.*

16.    This Court has personal jurisdiction over Defendants because Defendants have their headquarters and principal place of business in this District, have substantial contracts with this District, and have personally availed themselves of the laws and protections of this District.

17.    Venue is proper in this district pursuant to 18 U.S.C. Sec. 1391 because a substantial part of the acts and/or omissions giving rise to Plaintiff's claims occurred in this District, Defendants are headquartered in this District, and Defendants transact business

within this District. Venue is also proper because Plaintiff resides in this District.

## COMMON FACTUAL BACKGROUND

**A.    Defendants routinely disclosed the protected health information of its patients to third parties including Facebook.**

18.    Plaintiff Robert Elder is a patient of Defendants who has received treatment from the Valley Hospital. During the relevant time period Plaintiff utilized Valley Hospital's website and maintained a Facebook account.

19.    As numerous State and Federal laws have long recognized, physicians have a professional obligation to maintain the confidentiality of their patients' communications.

20.    Medical patients like Robert Elder have a legal interest in preserving the confidentiality of their communications with healthcare providers and have reasonable expectations of privacy that their Private Information and confidential communications will not be disclosed to third parties by Defendants without their express written consent and authorization.

21.    As a health care provider, Defendants have fiduciary, common law, and statutory duties to protect the confidentiality of patient information and communications.

22.    Defendants expressly and impliedly promise patients that they will maintain and protect the confidentiality of personally identifiable patient information and communications.

23.    Defendants operate a website for patients, www.valleyhealth.com, as well as patient portals where patients can "view summaries of [their] visits, email [their] doctor(s) and pay medical bills online."[5]

---

[5] *See e.g.*, https://www.valleyhealth.com/valley-medical-group

24.     Defendants' website is designed for interactive communication with patients, including scheduling appointments, searching for physicians, paying bills, requesting medical records, learning about medical issues and treatment options, and joining support groups.

25.     Notwithstanding patients' reasonable expectations of privacy, Defendants' legal duties of confidentiality, and Defendants' express promises to the contrary, Defendants disclosed the contents of Plaintiff's and Class Members confidential communications and Private Information via the tracking tools it embedded in the digital platforms operated by Defendants without patients' knowledge, authorization, or consent.

**B.      The nature of Defendants' unauthorized disclosure of patients' health care information.**

26.     Defendants' disclosures of patients' Private Information occurred because Defendants intentionally deployed source code on the digital platforms they operate, including www.valleyhealth.com, that caused patients' Private Information (as well as the exact contents of their communications) to be transmitted to third parties.

27.     By design, third parties receive and utilize the exact contents of patient communications before the full response from Defendants to patients has been rendered on the screen of the patient's computer device and while the communication between Defendants and the patient remains ongoing.

28.     Websites like those maintained by Defendants are hosted by a computer server through which the business in charge of the website exchanges and communicates with internet users via their web browsers.

29.     The basic command that web browsers use to exchange data and user communications is called a GET Request.[6]  When a patient wishes to visit Defendant's

---

[6] https://www.w3schools.com/tags/ref_httpmethods.asp

website, they must first enter the web address, www.valleyhealth.com, into their browser. The browser will then send a GET Request to Valley Health's server and the server will respond with the webpage and any code that Valley Health has embedded on the website, in this case e.g., the Facebook Pixel.

30.    For example, when a patient types "heart failure treatment" into the search box on Defendants' website and hits 'Enter,' the patient's web  browser makes a connection with the server for Defendants' website and sends the following request: "GET search/q=heart+failure+treatment."

31.    The other basic transmission command utilized by web browsers is POST, which is typically employed when a user enters data into a form on a website and clicks 'Enter' or some other form of submission button. POST sends the data entered in the form to the server hosting the website that the user is visiting.

32.    In response to receiving a GET or POST command, the server for the website with which the user is exchanging information will send a set of instructions to the web browser and command the browser with source code that directs the browser to render the website's responsive communication.

33.    Unbeknownst to most users, however, Valley Health's website server will also redirect the user's communications to unanticipated third parties. Valley Health's website visitors are not provided with actual notice that these disclosures are being made and are not provided with HIPAA compliant consent forms by Defendants.[7] Third parties (such as

---

[7] See Bulletin § *HIPAA compliance obligations for regulated entities when using tracking technologies*:

> Regulated entities may identify the use of tracking technologies in their website or mobile app's privacy policy, notice, or terms and conditions of use.[34] However, the Privacy Rule does **not** permit disclosures of PHI to a tracking technology vendor based solely on a regulated entity informing individuals in its privacy policy, notice, or terms and conditions of use that it plans to make such

Facebook and Google) use the information they receive to track user data and communications for marketing purposes.

34.     Defendants disclose the Private Information and communications of visitors to its website through a 1x1 pixel (the smallest dot on a user's screen) called a tracking pixel, a web-bug, or a web beacon. These tracking pixels are tiny and are purposefully camouflaged to remain invisible to users.

35.     Tracking pixels can be placed directly on a web page by a developer, or they can be funneled through a "tag manager" service to make the invisible tracking run more smoothly.  A tag manager further obscures the third parties to whom user data is transmitted.

36.     These tracking pixels can collect dozens of data points about individual website users who interact with a website. One of the world's most prevalent tracking pixels, called the Meta Pixel, is provided by Facebook and used by Defendants on their digital platforms.

37.     A web site developer who chooses to deploy third-party source code, like a tracking pixel, on their website must enter the third-party source code directly onto their website for every third party they wish to send user data and communications. This source code operates invisibly in the background when users visit a site employing such code.

**C.     Tracking pixels provide third parties with a trove of personally identifying data permitting them to uniquely identify the individuals browsing a website.**

38.     Tracking pixels are lines of source code embedded in Defendants' website. Tracking pixels are particularly pernicious because they result in the disclosure of a variety of data that permits third parties to determine the unique personal identities, interests, and

---

disclosures.  Regulated entities must ensure that all tracking technology vendors have signed a BAA and that there is an applicable permission prior to a disclosure of PHI

concerns of website visitors. While most users believe that the internet provides them with anonymity when, for example, they browse a hospital website for treatment information about a medical condition, that is not the case when the hospital website has embedded third party tracking devices, as Defendants have.

39.    For example, an IP address is a number that identifies a computer connected to the internet. IP addresses are used to identify and route communications on the internet. IP addresses of individual users are used by internet service providers, websites, and tracking companies to facilitate and track internet communications and content. IP addresses also offer advertising companies like Facebook a unique and semi-persistent identifier across devices—one that has limited privacy controls.[8]

40.    Because of their uniquely identifying characteristics, IP addresses are considered PII.[9] Tracking pixels can (and typically do) collect website visitors' IP addresses.

41.    Likewise, internet cookies also provide personally identifiable information. Cookies are small text files that web servers can place on a user's browser and computer when a user's browser interacts with a website server. Cookies are typically designed to acquire and record an individual internet user's communications and activities on websites and were developed by programmers to aid with online advertising.

42.    Cookies are designed to operate as a means of identification for internet users. Advertising companies like Facebook and Google have developed methods for monetizing and profiting from cookies. These companies use third-party tracking cookies to help them acquire and record user data and communications in order to sell targeted advertising that is

---

[8] https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/

[9] See Bulletin § *How do the HIPAA Rules apply to regulated entities' use of tracking technologies?*

customized to a user's personal communications and browsing history.  To build individual profiles of internet users, third party advertising companies assign each user a unique (or a set of unique) identifiers to each user.

43.    Cookies are considered personal identifiers, and tracking pixels can collect cookies from website visitors.

44.    A third type of personally identifying information is what data companies refer to as a "browser-fingerprint."  A browser-fingerprint is information collected about a computing device that can be used to identify the specific device.

45.    These browser-fingerprints can be used to uniquely identify individual users when a computing device's IP address is hidden or cookies are blocked and can provide a wide variety of data.  As Google explained, "With fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across  websites."[10] The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle techniques.[11]  Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.[12]

46.    In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[13]

---

[10] https://www.blog.google/products/chrome/building-a-more-private-web/
[11] https://pixelprivacy.com/resources/browser-fingerprinting
[12] https://www.blog.google/products/chrome/building-a-more-private-web/
[13]https://www.ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and- hardware-level-features/

47.     Browser-fingerprints are considered personal identifiers, and tracking pixels can collect browser-fingerprints from website visitors.

48.     A fourth kind of personally identifying information protected against disclosure is unique user identifiers (such as Facebook's "Facebook ID") that permit companies like Facebook to quickly and automatically identify the personal identity of its user across the internet whenever the identifier is encountered.  A Facebook ID is an identifying number string connected to a user's Facebook profile.[14]  Anyone with access to a user's Facebook ID can locate a user's Facebook profile.[15]

49.     Unique personal identifiers such as a person's Facebook ID are likewise capable of collection through pixel trackers.

**D.     Facebook**

50.     Facebook, a social media platform founded in 2004 and today operated by Meta Platforms, Inc., was originally designed as a social networking website for college students.

51.     Facebook describes itself as a "real identity" platform.[16]  This means that users are permitted only one account and must share "the name they go by in everyday life."[17]  To that end, Facebook requires users to provide their first and last name, along with their birthday, telephone number and/or email address, and gender, when creating an account.[18]

---

[14] https://www.facebook.com/help/211813265517027

[15] https://smallseotools.com/find-facebook-id/

[16]  https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701#:~:text=Facebook%20said%20in%20its%20most,of%20them%20than%20developed%20ones.

[17] https://transparency.fb.com/policies/community-standards/account-integrity-and-authentic-identity/

[18] https://www.facebook.com/help/406644739431633

52.     In 2007, realizing the value of having direct access to millions of consumers, Facebook began monetizing its platform by launching "Facebook Ads," proclaiming this service to be a "completely new way of advertising online," that would allow "advertisers to deliver more tailored and relevant ads."[19] Facebook has since evolved into one of the largest advertising companies in the world.[20] Facebook can target users so effectively because it surveils user activity both on and off its website through the use of tracking pixels.[21] This allows Facebook to make inferences about users based on their interests, behavior, and connections.[22]

53.     Today, Facebook provides advertising on its own social media platforms, as well as other websites through its Facebook Audience Network. Facebook has more than 2.9 billion users.[23]

54.     Facebook maintains profiles on users that include users' real names, locations, email addresses, friends, likes, and communications. These profiles are associated with personal identifiers, including IP addresses, cookies, and other device identifiers. Facebook also tracks non-users across the web through its internet marketing products and source code.

55.     Facebook offers several advertising options based on the type of audience that an advertiser wants to target. Those options include targeting "Core Audiences," "Custom Audiences," "Look Alike Audiences," and even more granulated approaches within audiences called "Detailed Targeting." Each of Facebook's advertising tools allow an advertiser to target users based, among other things, on their personal data, including

---

[19] https://about.fb.com/news/2007/11/facebook-unveils-facebook-ads/
[20] https://www.pewresearch.org/fact-tank/2021/06/01/facts-about-americans-and-facebook/
[21] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[22] https://www.facebook.com/business/ads/ad-targeting
[23] https://www.statista.com/statistics/264810/number-of-monthly-active-facebook-users-worldwide/

geographic location, demographics (e.g., age, gender, education, job title, etc.), interests, (e.g., preferred food, movies), connections (e.g., particular events or Facebook pages), and behaviors (e.g., purchases, device usage, and pages visited). This audience can be created by Facebook, the advertiser, or both working in conjunction.

56.     Ad Targeting has been extremely successful due to Facebook's ability to target individuals at a granular level. For example, among many possible target audiences, "Facebook offers advertisers 1.5 million people 'whose activity on Facebook suggests that they're more likely to engage with/distribute liberal political content' and nearly seven million Facebook users who 'prefer high-value goods in Mexico.'"[24] Aided by highly granular data used to target specific users, Facebook's advertising segment quickly became Facebook's most successful business unit, with millions of companies and individuals utilizing Facebook's advertising services.

**E.     Facebook's Meta Pixel tool allows Facebook to track the personal data of individuals across a broad range of third-party websites.**

57.     To power its advertising business, Facebook uses a variety of tracking tools to collect data about individuals, which it can then share with advertisers. These tools include software development kits incorporated into third-party applications, its "Like" and "Share" buttons (known as "social plug-ins"), and other methodologies, which it then uses to power its advertising business.

58.     One of Facebook's most powerful tools is called the "Meta Pixel."

59.     The Meta Pixel is a snippet of code embedded on a third-party website that tracks users' activities as users navigate through a website.[25] Once activated, the Meta Pixel

---

[24] https://www.nytimes.com/2018/04/11/technology/facebook-privacy-hearings.html

[25] https://developers.facebook.com/docs/meta-pixel/

"tracks the people and type of actions they take."[26]  Meta Pixel can track and log each page a

user visits, what buttons they click, as well as specific information that users input into a

website.[27]

60.    For example, if Meta Pixel is incorporated on a shopping website, it may log

what searches a user performed, which items of clothing a user clicked on, whether they added

an item to their cart, as well as what they purchased.  Along with this data, Facebook collects

identifying information like IP addresses, Facebook IDs, and other data that allow Facebook

to identify the user.  Once Facebook receives this information, Facebook processes it,

analyzes it, and assimilates it into datasets like its Core Audiences and Custom Audiences.

61.    The Meta Pixel collects data on website visitors regardless of whether they

have Facebook or Instagram accounts.[28]

62.    Facebook can then share analytic metrics with the website host, while at the

same time sharing the information it collects with third-party advertisers who can then target

users based on the information collected and shared by Facebook.

63.    Facebook touted Meta Pixel (which it originally called "Facebook Pixel") as

"a new way to report and optimize for conversions, build audiences and get rich insights about

how people use your website."[29]  According to Facebook, the Meta Pixel is an analytics tool

that allows business to measure the effectiveness of their advertising by understanding the

actions people take on their websites."[30]

64.    Facebook warns web developers that its Pixel is a personal identifier because

---

[26] https://www.facebook.com/business/goals/retargeting
[27] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[28] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector
[29] https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/
[30] https://www.oviond.com/understanding-the-facebook-pixel

it enables Facebook "to match your website visitors to their respective Facebook User accounts."[31]

65.    Facebook recommends that its Meta Pixel code be added to the base code on every website page (including the website's persistent header) to reduce the chance of browsers or code from blocking Pixel's execution and to ensure that visitors will be tracked.[32]

66.    Once Meta Pixel is installed on a business's website, the Meta Pixel tracks users as they navigate through the website and logs which pages are visited, which buttons are clicked, the specific information entered in forms (including personal information), as well as "optional values" set by the business website.[33] Meta Pixel tracks this data regardless of whether a user is logged into Facebook.  It is unclear how Facebook exploits the data collected from nonusers, but when asked by Congress about Facebook's business practices, Mark Zuckerberg conceded that the company maintains "shadow profiles" on nonusers of Facebook.[34]

67.    For Facebook, the Meta Pixel tool embedded on third-party websites, like the one maintained by Valley Health, acts as a conduit for information, sending the information it collects to Facebook through scripts running in a user's internet browser, similar to how a "bug" or wiretap can capture audio information. The information is sent in data packets, which include personally identifying data such as a user's IP address.

68.    For example, the Meta Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific data."[35]HTTP headers collect data including "IP addresses,

---

[31] https://developers.facebook.com/docs/meta-pixel/get-started
[32] https://developers.facebook.com/docs/meta-pixel/get-started
[33] https://developers.facebook.com/docs/meta-pixel/
[34] https://techcrunch.com/2018/04/11/facebook-shadow-profiles-hearing-lujan-zuckerberg/
[35] https://developers.facebook.com/docs/meta-pixel/

information about the web browser, page location, document, referrer and person using the website."[36] Pixel-specific data includes such data as the "Pixel ID and the Facebook Cookie."[37]

69.    Meta Pixel takes the information it harvests and sends it to Facebook with personally identifiable information, such as a user's IP address, name, email, phone number, and specific Facebook ID, which identifies an individual's Facebook user account.  Anyone who has access to this Facebook ID can use this identifier to quickly and easily locate, access, and view a user's corresponding Facebook profile.  Facebook stores this information on its servers, and, in some instances, maintains this information for years.[38]

70.    Facebook has a number of ways to uniquely identify the individuals whose data is being forwarded from third-party websites through the Meta Pixel.

71.    If a user has a Facebook account, the user data collected is linked to the individual user's Facebook account.  For example, if the user is logged into their Facebook account when the user visits a third-party website where the Meta Pixel is installed, many common browsers will attach third-party cookies allowing Facebook to link the data collected by Meta Pixel to the specific Facebook user.

72.    Alternatively, Facebook can link the data to a user's Facebook account through the "Facebook Cookie."[39] The Facebook Cookie is a workaround to recent cookie-blocking applications used to prevent websites from tracking users.[40]

73.    Facebook can also link user data to Facebook accounts through identifying

---

[36] https://developers.facebook.com/docs/meta-pixel/
[37] https://developers.facebook.com/docs/meta-pixel/
[38] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital
[39] https://clearcode.cc/blog/facebook-first-party-cookie-adtech/
[40] https://clearcode.cc/blog/difference-between-first-party-third-party-cookies/

information collected through Meta Pixel through what Facebook calls "Advanced Matching." There are two forms of Advanced Matching: manual matching and automatic matching.[41] Manual matching requires the website developer to manually send data to Facebook so that users can be linked to data. Automatic matching allows Meta Pixel to scour the data it receives from third-party websites to search for recognizable fields, including names and email addresses that correspond with users' Facebook accounts.

74.    While the Meta Pixel tool "hashes" personal data—obscuring it through a form of cryptography before sending the data to Facebook—that hashing does not prevent *Facebook* from viewing or using the data.[42] In fact, Facebook explicitly uses the hashed information it gathers to link pixel data to Facebook profiles.[43]

75.    Facebook also receives personally identifying information in the form of user's unique IP addresses that stay the same as users visit multiple websites. When browsing a third- party website that has embedded Facebook code, a user's unique IP address is forwarded to Facebook by GET requests, which are triggered by Facebook code snippets. The IP address enables Facebook to keep track of the website page visits associated with that address.

76.    Facebook also places cookies on visitors' computers. It then uses these cookies to store information about each user. For example, the "c_user" cookie is a unique identifier that identifies a Facebook user's ID. The c_user cookie value is the Facebook equivalent of a user identification number. Each Facebook user has one—and only one—unique c_user cookie. Facebook uses the c_user cookie to record user activities and communications.

---

[41] https://www.facebook.com/business/help/611774685654668?id=1205376682832142
[42] https://www.facebook.com/business/help/611774685654668?id=1205376682832142
[43] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-

77.     The data supplied by the c_user cookie allows Facebook to identify the Facebook account associated with the cookie.  One simply needs to log into Facebook, and then type www.facebook.com/#, with the c_user identifier in place of the "#."  For example, the c_user cookie for Mark Zuckerberg is 4.  Logging into Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck.

78.     Similarly, the "lu" cookie identifies the last Facebook user who logged in using a specific browser.  Like IP addresses, cookies are included with each request that a user's browser makes to Facebook's servers.  Facebook employs similar cookies such as "datr," "fr," "act," "presence," "spin," "wd," "xs," and "fbp" cookies to track users on websites across the   internet.[44]These cookies allow Facebook to easily link the browsing activity of its users to their real-world identities, and such highly sensitive data as medical information, religion, and  political preferences.[45]

79.     Facebook also uses browser fingerprinting to uniquely identify individuals. Web browsers have several attributes that vary between users, like the browser software system, plugins that have been installed, fonts that are available on the system, the size of the screen, color depth, and more.  Together, these attributes create a fingerprint that is highly distinctive. The likelihood that two browsers have the same fingerprint is at least as low as 1 in 286,777, and the accuracy of the fingerprint increases when combined with cookies and the user's IP address. Facebook recognizes a visitor's browser fingerprint each time a Facebook button is loaded on a third-party website page. Using these various methods, Facebook

---

[44] https://techexpertise.medium.com/facebook-cookies-analysis-e1cf6ffbdf8a#:~:text=browser%20session%20ends.-,%E2%80%9Cdatr%E2%80%9D,security%20and%20site%20integrity%20features.
[45] https://securehomes.esat.kuleuven.be/~gacar/fb_tracking/fb_plugins.pdf

can identify individual users, watch as they browse third-party websites like www.valleyhealth.com, and target users with advertising based on their web activity.

**D.    Defendants discretely embedded the Meta Pixel tool on its website, resulting in the capture and disclosure of patients' protected health information to Facebook.**

80.    A third-party website that incorporates Meta Pixel benefits from the ability to analyze a user's experience and activity on the website to assess the website's functionality and traffic.  The third-party website also gains information from its customers through Meta Pixel that can be used to target them with advertisements, as well as to measure the results of advertising efforts.

81.    Facebook's intrusion into the personal data of visitors to third-party websites incorporating the Meta Pixel is both significant and unprecedented.  When Meta Pixel is incorporated into a third-party website, unbeknownst to users and without their consent, Facebook gains the ability to surreptitiously 'listen in' on every user interaction with the website ranging from what the user clicks on to the personal information entered on a website search bar. Facebook aggregates this data against all websites.[46]  Facebook benefits from obtaining this information because it improves its advertising network, including its machine-learning algorithms and its ability to identify and target users with ads.

82.    Facebook provides websites using Meta Pixel with the data it captures in the "Meta Pixel page" in Events Manager, as well as tools and analytics to reach these individuals through future Facebook ads.[47]  For example, websites can use this data to create "custom audiences" to target the specific Facebook user, as well as other Facebook users who

---

[46] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[47] https://www.facebook.com/business/help/742478679120153?id=1205376682832142

match "custom audience's" criteria.[48]  Businesses that use Meta Pixel can also search through

Meta Pixel data to find specific types of users to target, such as men over a certain age.

83.    Meta Pixel is wildly popular and embedded on millions of websites.

Businesses install the Meta Pixel software code to help drive and decode key performance

metrics from visitor traffic to their websites.[49]  Businesses also use the Meta Pixel to build

custom audiences on Facebook that can be used for advertising purposes.[50]

84.    Shockingly, Meta Pixel is incorporated on many websites that are used to store

and convey sensitive medical information, that by law must be kept private.  Recently,

investigative journalists have determined that Meta Pixel is embedded on the websites of

many of the top hospitals in the United States.[51]  This results in sensitive medical information

being collected and then sent to Facebook when a user interacts with these hospital websites.

For example, when a user on many of these hospital websites clicks on a "Schedule Online"

button next to a doctor's name, Meta Pixel sends the text of the button, the doctor's name,

and the  search term (such as "cardiology") used to find the doctor to Facebook.  If the

hospital's website has a drop-down menu to select a medical condition in connection with

locating a doctor or making an appointment, that condition is also transmitted to Facebook

through Meta Pixel.

85.    According to the HHS Bulletin, this information is PHI and HIPAA covered

entities may not disclose this information with consent:

> Tracking technologies on a regulated entity's unauthenticated webpage that
> addresses specific symptoms or health conditions, such as pregnancy or
> miscarriage, or that permits individuals to search for doctors or schedule

---

[48] https://developers.facebook.com/docs/marketing-api/reference/custom-audience/
[49] https://instapage.com/blog/meta-pixel
[50] https://instapage.com/blog/meta-pixel
[51]        https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital- websites

appointments without entering credentials may have access to PHI in certain circumstances. For example, tracking technologies could collect an individual's email address and/or IP address when the individual visits a regulated entity's webpage to search for available appointments with a health care provider. In this example, the regulated entity is disclosing PHI to the tracking technology vendor, and thus the HIPAA Rules apply.[52]

86.    Facebook has designed the Meta Pixel such that Facebook receives information about patient activities on hospital websites as they occur in real time.  Indeed, the moment that a patient takes any action on a webpage that includes the Meta Pixel—such as clicking a button to register, login, or to create an appointment—Facebook code embedded on that page redirects the content of the patient's communications to Facebook while the exchange of information between

the patient and hospital is still occurring.

87.    Defendants are among the hospital systems who have embedded Meta Pixel on their websites.  At least as recently as September 21, 2022, when website visitor communicated through or interacted with Defendants' websites that incorporated Meta Pixel, such as to locate a  doctor or make an appointment, this information, including what the patient was being treated for, those communications were immediately and instantaneously routed to Facebook via the Meta Pixel.  The acquisition and disclosure of these communications occurred contemporaneously with the transmission of these communications by patients.

88.    This data, which included health conditions (e.g., addiction, Alzheimer's, heart disease), diagnoses, procedures, test results, the treating physician, medications, and other PHI and PII, is obtained and used by Facebook, as well as other parties, for the purpose of targeted advertising.

---

[52] See Bulletin §

89.    For example, a patient searching for a doctor on Defendant Valley Health System's website is asked to provide information about the specialty they are seeking a doctor for, such as "Dermatology," "Urology," or "Cardiology." The search criteria entered by prospective patients then provides them with specific physicians who can provide the requested services:



90.    All this data about the medical treatments sought by patients is disclosed to Facebook simultaneously in real time as patients transmit their information, along with other data, such as patient's unique Facebook ID that is captured by the c_user cookie, which allows Facebook to link this information to patients' unique Facebook accounts. Defendants also

discloses other personally identifying information to Facebook, such as patient IP addresses, cookie identifiers, browser-fingerprints, and device identifiers.

91. Defendants' pixel allows Facebook to intercept Plaintiff's and Class Members communications in real time by duplicating each GET Request or POST made by a visitor to the website and sending one communication to the intended recipient, Valley Health's server, and another surreptitious and simultaneous communication to Facebook. The communication is dispatched to Facebook at the same time it is sent to Valley Health and is thus intercepted by Facebook while the intended message is in transit to Valley Health.

92. Defendants disclosed such PII and PHI even when patients are searching for doctors on its website to assist them with sensitive conditions such as substance abuse and mental health:

93.    In other words, Facebook learned not just that patients are seeking treatment, but where and typically when they are seeking treatment, along with other information that patients would reasonably assume that Defendants is not sharing with third party marketing companies.

94.    The information disclosed by Defendants via the pixel is PHI even if there is no prior relationship between Defendants and the website visitor because "the information connects the individual to the regulated entity (i.e., it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus relates to the individual's past, present, or future health or health care or payment for care."[53]

95.    On information and belief, Defendants also disclosed patient information from other sections of its website including (but not limited to) communications that are captured by the website's search bar, communications that are captured when a patient searches for "Services" offered by Defendants, communications made by patients using the website's Patient Portal function, and communications made when patients are researching specific medical conditions such as COVID-19.

96.    By compelling visitors to its websites to disclose personally identifying data and sensitive medical information to Facebook and other third parties, Defendants knowingly disclosed information that allowed Facebook and other advertisers to link its patients' PHI to their real world identities and target them with advertising. Defendants intentionally shared the PHI of its patients with Facebook in order to gain access to the benefits of the Meta Pixel tool.

97.    Defendants facilitated the disclosure of Plaintiff's Private Information,

---

[53] See Bulletin § *How do the HIPAA Rules apply to regulated entities' use of tracking technologies?*

including sensitive medical information, to Facebook without his consent or authorization when he entered information on the digital platforms that Defendants maintain. Plaintiff continued to have his privacy violated when Defendants permitted Facebook and other companies to send him targeted advertising related to his medical condition.

98.     For example, Plaintiff visited Defendant Valley Health System's website at www.valleyhealth.com on numerous occasions and entered data, including sensitive medical information, such as details about his medical condition and doctor.  The information that Plaintiff transmitted included queries about treatment for his medical condition and potential treating physicians. Plaintiff believed that his interactions with Defendant's website were private, solely between himself and Valley Health, and  would not be shared with anyone besides his health care providers and their staff.

99.     After Plaintiff visited Defendants' website, he began receiving advertisements on his Facebook page related to the medical treatment that he received at Defendants' hospital.

100.     Defendants configured which information would be disclosed by the Meta Pixel and knew that by embedding the Meta Pixel—a Facebook advertising tool—on its website, it was permitting Facebook to collect, use, and share Plaintiff's and the Class Members' PHI, including sensitive medical information and personally identifying data.

101.     Defendants were also aware that such information would be shared with Facebook simultaneously with patients' interactions with its websites. Defendants made the decision to barter its patients' PHI to Facebook because it wanted access to the Meta Pixel tool. While that bargain may have benefited Defendants and Facebook, it also betrayed the privacy rights of Plaintiff and Class Members.

F.     **Plaintiff and the Class Members did not consent to the interception and disclosure of their protected health information.**

102.     Plaintiff and Class Members had no idea when they interacted with Defendants' websites that their personal data, including sensitive medical data, was being collected and simultaneously transmitted to Facebook.  That is because, among other things, Meta Pixel is secretly and seamlessly integrated into Defendants' websites and is invisible to patients visiting those websites.

103.     For example, when Plaintiff visited Defendant Valley Health System's website at www.valleyhealth.com there was no indication that the Meta Pixel was embedded on that website or that it would collect and transmit his sensitive medical data to Facebook.

104.     Plaintiff and his fellow Class Members could not consent to Defendants' conduct when there was no indication that their sensitive medical information would be collected and transmitted to Facebook in the first place.

105.     While Defendants purports to have a privacy policy, that privacy policy is effectively hidden from patients, buried at the bottom of Defendant Valley Health System's homepage in type so small as to be unreadable to many visitors:



106.    Defendant Valley Health System's "Notice of Privacy Practices" gives no indication to patients that Defendants routinely allow Facebook to capture and exploit patients' Personal Health Information.   Indeed, Defendant Valley Health System expressly promises in its "Privacy Policy" that it is committed to protecting patients' medical information:

II. OUR PLEDGE REGARDING YOUR INFORMATION.

We understand that information about you and your health is personal. We are committed to protecting such information about you. We create a record of the care and services you receive at Valley Health System. We need this record to provide you with quality care and to comply with certain legal requirements.

This Notice applies to all your individually identifiable health information collected, created or received by Valley Health System, and relates to your past, present or future physical or mental health or condition, or Valley Health System providing healthcare to you in the past, present or in the future. This is referred to as your "protected health information". Your protected health information may be found in our records of your care generated by Valley Health System facilities, agencies and practices, their healthcare professionals and other healthcare professionals. Other healthcare professionals, such as your personal doctor, may have different policies or notices regarding the doctor's use and disclosure of your protected health information created in the doctor's office or clinic.

This Notice will tell you about the ways in which we may use and disclose protected health information about you. We also describe your rights and certain obligations we have regarding the use and disclosure of such information.

We are required by law to:

- make sure that protected health information that identifies you is kept private;
- give you this Notice of our legal duties and privacy practices concerning such information about you; and
- follow the terms of the Notice that is currently in effect.

107. Even if a patient stumbled upon Defendant Valley Health System's "Notice of Practices," nothing in that notice would be understood by any reasonable patient to mean that Defendants is routinely allowing Facebook to capture and exploit patients' Personal Health Information.

108. Indeed, Defendants specifically promise current and prospective patients in its privacy policy that it will *never* disclose their Personal Health Information for marketing purposes without their written authorization:

IX. OTHER USES OF PROTECTED HEALTH INFORMATION.

Other uses and disclosures of information not covered by this Notice or the laws that apply to us will be made only with your written permission. Such information includes most (i) uses and disclosures of psychotherapy notes (if recorded by us); (ii) uses and disclosures of your protected health information for marketing purposes; (iii) disclosures that constitute a sale of your protected health information; and (iv) other uses and disclosures that may not be described in this Notice.

109. Moreover, even if Defendants' Privacy Policy disclosed the use of a tracking pixel, such disclosure would not satisfy HIPAA regulations:

> Regulated entities may identify the use of tracking technologies in their website or mobile app's privacy policy, notice, or terms and conditions of use.34 However, the Privacy Rule does not permit disclosures of PHI to a tracking technology vendor based solely on a regulated entity informing individuals in its privacy policy, notice, or terms and conditions of use that it plans to make such disclosures. Regulated entities must ensure that all tracking technology

vendors have signed a BAA and that there is an applicable permission prior to a disclosure of PHI.[54]

110.     Defendants do not have a legal right to share Plaintiff's and Class Members' Protected Health Information without their written consent to third parties, because this information is protected from such disclosure by law. *E.g.* N.J.S.A. 26:2H-12.8(f); 45 C.F.R. § 164.508. Nor are Defendants permitted to disclose patients' Protected Health Information to advertising and marketing companies like Facebook without express written authorization from patients. N.J.S.A. 26:2H-12.8(g).

111.     Defendants failed to obtain a valid written authorization from Plaintiff or any of the Class Members to allow the capture and exploitation of their personally identifiable information and the contents of their communications for marketing purposes.

112.     A patient's reasonable expectation that their health care provider will not share their information with third parties for marketing purposes is not subject to waiver via an inconspicuous privacy policy hidden away on a company's website. Such "Browser-Wrap" statements do not create an enforceable contract against consumers. Further, Defendants expressly promised its patients that it would never sell or use their Personal Health Information for marketing purposes without express authorization.

113.     Accordingly, Defendants lacked authorization to intercept, collect, and disclose Plaintiff and Class Members' Personal Health Information to Facebook or aid in the same.

**G.      The disclosures of personal patient data to Facebook are unnecessary.**

114.     There is no information anywhere on the digital platforms operated by Defendants that would alert patients that their most sensitive information (such as their

---

[54] See Bulletin § *HIPAA compliance obligations for regulated entities when using tracking technologies*

identifiers, their medical conditions, and their medical providers) is being automatically transmitted to Facebook. Nor are any of the disclosures of Private Information to Facebook necessary for Defendants to maintain their healthcare website or provide medical services to patients.

115. For example, it is possible for a healthcare website to provide a doctor search function without allowing disclosures to third-party advertising companies about patient sign ups or appointments. It is also possible for a website developer to utilize tracking tools without allowing disclosure of patients' Private Information to companies like Facebook. Likewise, it is possible for Defendants to provide medical services to patients without sharing their Private Information with Facebook so that this information can be exploited for advertising purposes.

116. Despite this, Defendants willfully chose to implement Meta Pixel on their digital platforms and disclose the Private Information about its patients and website visitors, including the contents of their communications with Defendants, to third-parties, including Facebook.

**H.      Plaintiff and Class Members have a reasonable expectation of privacy in their Personal Health Information, especially with respect to sensitive medical information.**

117. Plaintiff and Class Members have a reasonable expectation of privacy in their Private Information, including personally identifying data and sensitive medical information. Defendants' surreptitious interception, collection, and disclosure of patients' Private Information to Facebook violated Plaintiff and Class Member's privacy interests.

118. Patient Personal Health Information is specifically protected by law. *E.g.* N.J.S.A. 26:2J-27; N.J.S.A. 26:5C-7; N.J.S.A. 26:5C-8. The prohibitions against disclosing patient Personal Health Information include prohibitions against disclosing personally identifying

information such as patient names, IP addresses, and other unique characteristics or codes.
*E.g.*

N.J.S.A. 26:2H-12.8(g); 45 C.F.R. § 164.514.

119.    New Jersey courts have long recognized that physicians owe a duty of confidentiality to patients, which prohibits them from disclosing patients' health information without patients' written consent. *Stempler v. Speidell*, 100 N.J. 368, 375 (N.J. 1985).  And New Jersey law subjects medical providers who treat conditions such as HIV to heightened duties of confidentiality.  N.J.S.A. 26:5C-14.  This legal framework applies to health care providers, such as Defendants.

120.     Patient information is further protected under HIPAA, which implements regulations set by HHS and establishes a national standard to protect patient health care information, medical records and other individually identifiable information.

121.     Given the public policy expressed by these laws and Defendants' express promises that it would never share their Private Information for marketing purposes without their written permission, Plaintiff and the Members of the Class had a reasonable expectation of privacy in their PII and PHI.

122.    Several studies examining the collection and disclosure of consumers' sensitive medical information confirm that the disclosure of sensitive medical information violates expectations of privacy that have been established as general social norms.

123.    Privacy polls and studies also uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

124.    For example, a recent study by *Consumer Reports* showed that 92% of

Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believed that internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[55]

125.    Users act consistently with these preferences. For example, following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to share data when prompted.[56]

126.    The concern about sharing personal medical information is compounded by the reality that advertisers view this type of information as particularly valuable. Indeed, having access to the data women share with their healthcare providers allows advertisers to obtain data on children before they are even born. As one recent article noted, "What is particularly worrying about this process of datafication of children is that companies like [Facebook] are harnessing and collecting multiple typologies of children's data and have the potential to store a plurality of data traces under unique ID profiles."[57]

127.    Many privacy law experts have expressed serious concerns about patients' sensitive medical information being disclosed to third-party companies like Facebook. As those critics have pointed out, having a patient's personal health information disseminated in ways the patient is unaware of could have serious repercussions, including affecting their ability to obtain life insurance, how much they might pay for such coverage, the rates they

---

[55]    https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and- car-safety-a3980496907
[56] https://www.wired.co.uk/article/apple-ios14-facebook

[57] https://thereader.mitpress.mit.edu/tech-companies-are-profiling-us-from-before-birth/

might be charged on loans, and the likelihood of their being discriminated against.

**I.    Plaintiff's Personal Health Data that Defendants collected, disclosed, and used is Plaintiff's property, has economic value, and its illicit disclosure has caused Plaintiff harm.**

128.    It is common knowledge that there is an economic market for consumers' personal data—including the kind of data that Defendants has collected and disclosed from Plaintiff and Class Members.

129.    In 2013, the *Financial Times* reported that the data-broker industry profits from the trade of thousands of details about individuals, and that within that context, "age, gender and location information" were being sold for approximately "$0.50 per 1,000 people."[58]

130.    In 2015, *TechCrunch* reported that "to obtain a list containing the names of individuals suffering from a particular disease," a market participant would have to spend about "$0.30" per name.  That same article noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge" and that the value of a single user's data can vary from $15 to more than $40 per user.[59]

131.    In a 2021 Washington Post article, the legal scholar Dina Srinivasan said that consumers "should think of Facebook's cost as [their] data and scrutinize the power it has to set its own price."[60]  This price is only increasing.  According to Facebook's own financial statements, the value of the average American's data in advertising sales rose from $19 to $164 per year between 2013 and 2020.[61]

132.    Despite the protections afforded by law, there is an active market for health

---

[58] https://ig.ft.com/how-much-is-your-personal-data-worth/
[59] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/
[60] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/
[61] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/

information.  Medical information obtained from health providers garners substantial value because of the fact that it is not generally available to third party data marketing companies because of the strict restrictions on disclosure of such information by state laws and provider standards, including the Hippocratic oath. Even with these restrictions, however, a multi-billion- dollar market exists for the sale and purchase of such private medical information.[62]

133.    Further, individuals can sell or monetize their own data if they so choose.  For example, Facebook has offered to pay individuals for their voice recordings,[63] and has paid teenagers and adults up to $20 a month plus referral fees to install an app that allows Facebook to collect data on how individuals use their smart phones.[64]

134.    A myriad of other companies and apps such as DataCoup, Nielsen Computer, Killi, and UpVoice also offer consumers money in exchange for access to their personal data.[65]

135.    Given the monetary value that data companies like Facebook have already paid  for personal information in the past, Defendants have deprived Plaintiff and the Class Members of the economic value of their sensitive medical information by collecting, using, and disclosing  that information to Facebook and other third parties without consideration for Plaintiff and the Class Member's property.

**J.    Defendants is enriched by making unlawful, unauthorized, and unnecessary disclosures of its patients' protected health information.**

---

[62] https://revealnews.org/blog/your-medical-data-is-for-sale-and-theres-nothing-you-can-do-about-it/;  *see  also https://slate.com/technology/2022/06/health-data-brokers-privacy.html*

[63]    https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognition-viewpoints-proununciations-app

[64] https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html

[65] https://www.creditdonkey.com/best-apps-data-collection.html;
*see also https://www.monetha.io/blog/rewards/earn-money-from-your-data/*

136.    In exchange for disclosing the Private Information about its patients and website visitors, Defendants are compensated by Facebook with enhanced online advertising services, including (but not limited to) retargeting and enhanced analytics functions.

137.    Retargeting is a form of online targeted advertising that targets users with ads based on their previous internet actions, which is facilitated through the use of cookies and tracking pixels. Once an individual's data is disclosed and shared with a third-party marketing company, the advertiser is able to show ads to the user elsewhere on the internet.

138.    For example, retargeting could allow a web-developer to show advertisements on other websites to customers or potential customers based on the specific communications exchanged by a patient or their activities on a website. Using the Meta Pixel, a website could target ads on Facebook itself or on the Facebook advertising network. The same or similar advertising can be accomplished via disclosures to other third-party advertisers and marketers.

139.    Once personally identifiable information relating to patient communications is disclosed to third parties like Facebook, Defendants loses the ability to control how that information is subsequently disseminated and exploited.

140.    The monetization of the data being disclosed by Defendants, both by Defendants and Facebook, demonstrates the inherent value of the information being collected.

**K.    Facebook's history of egregious privacy violations.**

141.    Defendants knew or should have known that Facebook could not be trusted with its patients' sensitive medical information.

142.    Due to its ability to target individuals based on granular data, Facebook's ad-targeting capabilities have frequently come under scrutiny. For example, in June 2022,

Facebook entered into a settlement with the Department of Justice regarding its Lookalike Ad service, which permitted targeted advertising by landlords based on race and other demographics in a discriminatory manner. That settlement, however, reflected only the latest in a long history of egregious privacy violations by Facebook.

143.   In 2007, when Facebook launched "Facebook Beacon," users were unaware that their online activity was tracked, and that the privacy settings originally did not allow users to opt-out. As a result of widespread criticism, Facebook Beacon was eventually shut down.

144.   Two years later, Facebook made modifications to its Terms of Service, which allowed Facebook to use anything a user uploaded to its site for any purpose, at any time, even after the user ceased using Facebook. The Terms of Service also failed to provide for any way for users to completely delete their accounts. Under immense public pressure, Facebook eventually returned to its prior Terms of Service.

145.   In 2011, Facebook settled charges with the Federal Trade Commission relating to its sharing of Facebook user information with advertisers, as well as its false claim that third- party apps were able to access only the data they needed to operate when—in fact—the apps could access nearly all of a Facebook user's personal data. The resulting Consent Order prohibited Facebook from misrepresenting the extent to which consumers can control the privacy of their information, the steps that consumers must take to implement such controls, and the extent to which Facebook makes user information available to third parties.[66]

146.   Facebook found itself in another privacy scandal in 2015 when it was revealed that Facebook could not keep track of how many developers were using previously

---

[66] https://www.ftc.gov/legal-library/browse/cases-proceedings/092-3184-182-3109-c-4365-facebook-inc-matter

downloaded Facebook user data.  That same year, it was also revealed that Facebook had violated users' privacy rights by harvesting and storing Illinois' users' facial data from photos without asking  for their consent or providing notice.  Facebook ultimately settled claims related to this unlawful act for $650 million.[67]

147.    In 2018, Facebook was again in the spotlight for failing to protect users' privacy. Facebook representatives testified before Congress that a company called Cambridge Analytics may have harvested the data of up to 87 million users in connection with the 2016 election.  This led to another FTC investigation in 2019 into Facebook's data collection and privacy practices, resulting in a record-breaking five-billion-dollar settlement.

148.    Likewise, a different 2018 report revealed that Facebook had violated users' privacy by granting access to user information to over 150 companies.[68]  Some companies were even able to read users' private messages.

149.    In June 2020, after promising users that app developers would not have access to data if users were not active in the prior 90 days, Facebook revealed that it still enabled third- party developers to access this data.[69]  This failure to protect users' data enabled thousands of developers to see data on inactive users' accounts if those users were Facebook friends with someone who was an active user.

150.    On February 18, 2021, the New York State Department of Financial Services released a report detailing the significant privacy concerns associated with Facebook's data collection practices, including the collection of health data.  The report noted that while Facebook maintained a policy that instructed developers not to transmit sensitive

---

[67] A similar case is pending in Texas.
[68] https://www.cnbc.com/2018/12/19/facebook-gave-amazon-microsoft-netflix-special-access-to-data-nyt.html
[69] https://fortune.com/2020/07/01/facebook-user-data-apps-blunder/

medical information, Facebook received, stored, and analyzed this information anyway.  The report concluded that "[t]he information provided by Facebook has made it clear that Facebook's internal controls on this issue have been very limited and were not effective … at preventing the receipt of sensitive data."[70]

151.    The New York State Department of Financial Service's concern about Facebook's cavalier treatment of private medical data is not misplaced.  In June 2022, the FTC finalized a different settlement involving Facebook's monetizing of sensitive medical data.  In that case, the more than 100 million users of Flo, a period and ovulation tracking app, learned something startling:  the company was sharing their data with Facebook. When a user was having her period or informed the app of her intention to get pregnant, Flo would tell Facebook, which  could then use the data for all kinds of activities including targeted advertising.  In 2021, Flo settled with the Federal Trade Commission for lying to its users about secretly sharing their data with Facebook, as well as with a host of other internet advertisers, including Google, Fabric, AppsFlyer, and Flurry.  The FTC reported that Flo "took no action to limit what these companies could do with users' information."[71]

152.    More recently, Facebook employees admitted to lax protections for sensitive user data.  Facebook engineers on the ad business product team conceded in a 2021 privacy review that "We do not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose."[72]

153.    These revelations were confirmed by an article published by the Markup on June

---

[70] https://www.dfs.ny.gov/system/files/documents/2021/02/facebook_report_20210218.pdf
[71] https://slate.com/technology/2022/06/health-data-brokers-privacy.html
[72] https://www.vice.com/en/article/akvmke/facebook-doesnt-know-what-it-does-with-your-data-or-where-it-goes

16, 2022, which found during the course of its investigation that Facebook's purported "filtering" failed to discard even the most obvious forms of sexual health information. Worse, the article found that the data that the Meta Pixel was sending Facebook from hospital websites not only included details such as patients' medications, descriptions of their allergic reactions, details about their upcoming doctor's appointments, but also included patients' names, addresses, email addresses, and phone numbers.[73]

154.    Despite knowing that the Meta Pixel code embedded in its websites was sending patients' Personal Health Information to Facebook, Defendants did nothing to protect its patients from egregious intrusions into its patients' privacy, choosing instead to benefit at those patients' expense.

## TOLLING, CONCEALMENT, AND ESTOPPEL

155.    The applicable statutes of limitation have been tolled as a result of Defendants' knowing and active concealment and denial of the facts alleged herein.

156.    Defendants seamlessly incorporated Meta Pixel and other trackers into its websites, providing no indication to users that they were interacting with a website enabled by Meta Pixel. Defendants had knowledge that its websites incorporated Meta Pixel and other trackers yet failed to disclose that by interacting with Meta-Pixel enabled websites that Plaintiff and Class Members' sensitive medical information would be intercepted, collected, used by, and disclosed to Facebook.

157.    Plaintiff and Class Members could not with due diligence have discovered the full scope of Defendants' conduct, because there were no disclosures or other indication that they were interacting with websites employing Meta Pixel.

---

[73]         https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital- websites

158. The earliest that Plaintiff and Class Members, acting with due diligence, could have reasonably discovered this conduct would have been on June 16, 2022, following the release of the Markup's investigation.

159. All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort. Defendants are therefore estopped from relying on any statute of limitations defenses.

## CLASS ACTION ALLEGATIONS

160. Plaintiff brings this action individually and as a class action against Defendants.

161. Plaintiff seeks class certification for the following proposed Class:

> During the fullest period allowed by law, all citizens of the United States who are, or were, patients of Valley Health System, Inc. or any of its affiliates and who exchanged communications at Defendants' websites, including www.valleyhealth.com and any other Valley Health affiliated website that caused disclosures of patient personally identifiable information and communications to third parties, including (but not limited to) Facebook (the "**Class**").

162. Excluded from the proposed Class are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) the Defendants, Defendants' subsidiaries, affiliates, parents, successors, predecessors, and any entity in which the Defendants or their parent has a controlling interest and their current or former employees, officers, and directors; and (3) Plaintiff's counsel and Defendants' counsel.

163. Plaintiff reserves the right to redefine the Class and/or add Subclasses at, or prior to, the class certification stage, in response to discovery or pursuant to instruction by the Court.

164. Plaintiff and the Class Members satisfy the numerosity, commonalty, typicality, adequacy, and predominance prerequisites for suing as representative parties

pursuant to Rule 23(b).

165.    **Numerosity:** While the exact number of Class Members is unknown to Plaintiff at this time, the Class, based on information and belief, consists of thousands of people dispersed throughout the country such that joinder of all members is impracticable. The exact number of Class Members can be determined by review of information maintained by Defendants.

166.    **Commonality and Predominance:** There are questions of law and fact common to Class Members and which predominate over any questions affecting only individual members. A class action will generate common answers to the questions below, which are apt to drive resolution:

a.    Whether Defendants' acts and practices violated Plaintiff's and Class Members' privacy rights;

b.    Whether Defendants' acts and practices violate 18 U.S.C. Sec. 2510, *et seq*.

c.    Whether Defendants' acts and practices violate N.J.S.A. 2A:156A-3(a),(b), and/or (c)

d.    Whether Defendants' acts and practices violate N.J.S.A. 26:2H-12.8(f). and/or (g)

e.    Whether Defendants knowingly allowed the surreptitious collection and disclosure of Plaintiff and Class Members' Personal Health Information to Facebook;

f.    Whether Defendants' acts and practices constitute a breach of the duty of physician-patient confidentiality;

g.    Whether Defendants profited from disclosures of patient Personal Health Information to third parties including Facebook;

h.    Whether Defendants were unjustly enriched;

i.    Whether Defendants' acts and practices harmed and continue to harm Plaintiff and Class Members and, if so, the extent of that injury;

j.    Whether Plaintiff and Class Members are entitled to equitable relief including, but not limited to, injunctive relief, restitution, and disgorgement; and

k.    Whether Plaintiff and Class Members are entitled to actual, statutory, or other

forms of damages, and other monetary relief.

167.    These common questions of law and fact predominate over any questions affecting only the individual Class Members.

168.    Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff individually and on behalf of the other Class Members. Identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quantity and quality, to the numerous questions that dominate this action.

169.    **Typicality:** Plaintiff's claims are typical of the claims of other Class Members and Plaintiff have substantially the same interest in this matter as other Class Members. Plaintiff has no interests that are antagonist to, or in conflict with, the interests of other members of the Class.  Plaintiff's claims arise out of the same set of facts and conduct as all other Class Members.  Plaintiff and all Class Members are patients or website visitors of Defendants who used the websites set up by Defendants for patients and are victims of Defendants' respective unauthorized disclosures to third parties including Facebook. All claims of Plaintiff and Class Members are based on Defendants' wrongful conduct and unauthorized disclosures.

170.    **Adequacy of Representation:**  Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are coincident with, and not antagonistic to, those of other Class Members he seeks to represent. Plaintiff has no disabling conflicts with Class Members.  Accordingly, Plaintiff is an adequate representative of the Class and, along with counsel, will fairly and adequately protect the interests of the Class and any Subclasses.

171.    **Superiority:**  A class action is the superior method for fair and efficient

adjudication of the controversy.  Although all Class Members have claims against Defendants, the likelihood that individual Class Members will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation.  The damages, harm, and other financial detriment suffered individually by Plaintiff and other Class Members are relatively small compared to the burden and expense that would be required to litigate their claims on an individual basis against Defendants, making it impractical for Class Members to individually seek redress for Defendants' wrongful conduct.  Moreover, serial adjudication in numerous venues is not efficient, timely, or proper.  Judicial resources would be unnecessarily depleted by prosecution of individual claims.  The prosecution of separate actions by individual Class Members could create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which could establish incompatible standards of conduct for Defendants or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the members of the Class Members who are not parties to the adjudications.  If a class action is not permitted, Class Members will continue to suffer losses and Defendants' misconduct will continue without proper remedy.

172.    Plaintiff anticipates no unusual difficulties in the management of this litigation as a class action.  The Class is readily ascertainable and direct notice can be provided from the records maintained by Defendants, electronically or by publication, the cost of which is properly imposed on Defendants.

173.    For the above reasons, among others, a class action is superior to other available methods for the fair and efficient adjudication of this action.

### CAUSES OF ACTION

### COUNT I
**Violation of the Electronic Communications Act
("ECPA"), 18 U.S.C. Sec. 2510, *et seq.*
(On Behalf of Plaintiff and the Class)**

174.    Plaintiff re-alleges and incorporates by reference all paragraphs above as if set forth herein.

175.    A violation of the ECPA occurs where any person "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any…electronic communication" or "intentionally discloses, or endeavors to disclose, to any person the contents of any… electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n]…electronic communication" or "intentionally uses or endeavors to use, the contents of any … electronic communication, knowing or having reason to know that the information was obtained through then [unlawful] interception of a[n] … electronic communication." 18 U.S.C. Sec. 2511 (1)(a), (c) – (d).

176.    In addition, "a person or entity providing an electronic communication service to the public shall not intentionally divulge the contents of any communication [ ] while in transmission on that service to any person or entity other than an addressee or intended recipient of such communication or an agent of such addressee or intended recipient." 18 U.S.C. Sec. 2511(3)(a).

177.    As defined in 18 U.S.C. Sec. 2510 (12), "electronic communication" means "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo optical system that affects interstate or foreign commerce."

178.    As defined in 18.U.S.C. Sec. 2510(4), "intercept" means "the aural or other

45

acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device."

179.    As defined in 18 U.S.C. Sec. 2510(8) "contents" includes "any information relating to the substance, purport, or meaning" of the communication at issue.

180.    As defined in 18 U.S.C. Sec. 2510(15), an "electronic communication service" means "any service which provides to users thereof the ability to send or receive wire or electronic communications."

181.    18 U.S.C. Sec. 2520(a) provides a private right of action to any person whose wire, oral, or electronic communication is intercepted.

182.    Plaintiff and Class Members' use of Defendants' website, www.valleyhealth.com, is an electronic communication under the ECPA.

183.    Defendant Valley Health System's website, www.valleyhealth.com is an electronic communication service under the ECPA.

184.    Whenever Plaintiff and Class Members interacted with Defendants' website, through the Meta Pixel it deployed and ran on its website, Defendants intentionally endeavored to intercept, and did intercept, Plaintiff and Class Members' electronic communications without authorization or consent.

185.    Whenever Plaintiff and Class Members interacted with Defendants' website, through the Meta Pixel Defendants deployed and ran on their website, Defendants contemporaneously and intentionally disclosed, and endeavored to disclose the contents of Plaintiff and Class Member's electronic communications to Facebook without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation

46

of the ECPA.

186.    Whenever Plaintiff and Class Members interacted with Defendants' website, through the Meta Pixel they deployed and ran on their website, Defendants contemporaneously and intentionally used, and endeavored to use the contents of Plaintiff's and Class Members' electronic communications, for purposes other than providing health care services to Plaintiff and Class Members without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA.

187.    Whenever Plaintiff and Class Members interacted with Defendants' website, through the Meta Pixel they deployed and ran on their website, Defendants contemporaneously and intentionally redirected the contents of Plaintiff and Class Members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, including Facebook.

188.    Whenever Plaintiff and Class members interacted with Defendants' website, through the Meta Pixel they deployed and ran on their website, Defendants contemporaneously and intentionally divulged the contents of Plaintiff and Class Members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, including Facebook.

189.    Defendants intentionally intercepted and used the contents of Plaintiff and Class Members' electronic communications for the unauthorized purpose of disclosing and, profiting from, Plaintiff's and Class members' communications.

190.    Plaintiff and Class Members did not authorize Defendants to acquire the content of their communications for purposes of sharing and selling the PII and PHI contained therein.

191.    Plaintiff, individually, and on behalf of Class Members, seeks all monetary and non-

monetary relief allowed by law, including actual damages, statutory damages, punitive damages, preliminary and other equitable or declaratory relief, and attorneys' fees and costs.

**COUNT II**
**Interception of Wire Communications in Violation**
**of N.J.S.A. 2A:156A-3**
**(On Behalf of Plaintiff and the Class)**

192.    Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

193.    Plaintiff brings this claim on behalf of himself and all members of the Class.

194.    All conditions precedent to this action have been performed or have occurred.

195.    N.J.S.A. 2A:156A-4 provides that it is unlawful for a person not acting under law to intercept a wire communication "for the purpose of committing any criminal or tortious act."

196.    Defendants intercepted Plaintiff's and Class Members' wire communications for the purpose of committing multiple criminal and tortious acts, including, but not limited to, the criminal and tortious acts specified below.

197.    For example, Defendants intercepted Plaintiff's and Class Members' wire communications for the purpose of disclosing those communications to third parties including Facebook without the knowledge, consent, or written authorization of Plaintiff or Class Members. Because the disclosure of Plaintiff's and Class Members' Private Information to third parties including Facebook without consent or proper authorization is both a criminal and tortious act that violates multiple laws, including (but not limited to) N.J.S.A. 2A:156A-3(b), N.J.S.A. 2A:156A-3(c), 45 CFR § 164.508(a)(1), N.J.S.A. 26:2H-12.8(f), N.J.S.A. 26:2H-12.8(g), and N.J.S.A. 26:5C-8, Defendants' misconduct falls within the ambit of New Jersey's wiretapping statute.

198.    Further, Defendants intentionally intercepted Plaintiff's and Class Members' wire communications for the illegitimate purpose of committing further tortious and criminal acts by misappropriating Plaintiff and Class Member's valuable Private Information so that Defendants could not only spy on Plaintiff's and Class Members' web surfing activities but could also monetize and exploit their Private Information without paying fair value for such valuable information.

199.    Defendants' interception of Plaintiff's and Class Member's wire communications for the purpose of bartering and/or selling Plaintiff's and Class Members' Private Information to Facebook in return for access to Facebook's Meta Pixel tool also constitutes the tort of conversion under New Jersey law.  Under New Jersey law, conversion occurs where there is an unauthorized assumption of the right of ownership over the personal property of another to the exclusion of the owner's rights.  By disclosing Plaintiff's and Class Members' Private Information without their knowledge or consent, Defendants deprived Plaintiff and Class Members of their property rights in their Private Information and caused Plaintiff and Class Members injury by diminishing the value of their Private Information, depriving Plaintiff and Class Members of the full value of the medical services for which they paid, which included Defendants' obligation to maintain the confidentiality of their Private Information, and depriving Plaintiff and Class Members of their right to control who had access to their sensitive medical and personal information. Defendants' decision to steal and exploit Plaintiff's and Class Members' Private Information without their knowledge or consent is sufficient to bring Defendants'  conduct within the ambit of New Jersey's wiretapping statute.

200.    Defendants'    interception    of    Plaintiff's    and    Class    Members'    wire

communications for the purpose of disclosing their Private Information to Facebook is also a tortious act that constitutes a breach of the fiduciary duty of confidentiality owed by doctors and hospital systems to their patients as set forth by the New Jersey Supreme Court in *Stempler v. Speidell*, 100 N.J. 368, 375 (1985).

201.    Defendants' interception of Plaintiff's and Class Members' wire communications for the purpose of disclosing their Private Information to Facebook  and other third parties also constitute the tort of invasion of privacy under New Jersey law— specifically an intrusion on Plaintiff's and Class Members' seclusion. Plaintiff and Class Members had a reasonable expectation of privacy that Defendants would not share their Private Information with Facebook so  that Facebook could target them with  advertising. Defendants obtained Plaintiff's and Class Members' Private Information by falsely promising that it would safeguard the confidentiality of that information and that it would never disclose such information to third parties for marketing purposes without written consent.  The method through which Defendants obtained Plaintiff's and Class Members' Private Information (i.e., lying to patients about how their Private Information would be used) would be objectionable to a reasonable person.  Defendants' disclosure of Plaintiff's and Class Members' Private Information thus violated their right to privacy.

202.    Any person whose wire communication is intercepted, disclosed, or used in violation of the statute may recover relief in a civil cause of action against any person who intercepts, discloses, or uses, or procures any other person to intercept, disclose, or use such communications.  N.J.S.A. 2A:156A-32.

203.    Defendants violated the New Jersey Wiretap Act by intercepting Plaintiff's and Class Members' wire communications in violation of N.J.S.A. 2A:156A-3(a).

204.    Defendants separately violated the Wiretap Act by disclosing the contents of Plaintiff's and Class Members' wire communications to Facebook in violation of N.J.S.A. 2A:156A-3(b).

205.    Defendants also separately violated the Wiretap Act by "[p]urposely" using the contents of Plaintiff's and Class Members' wire communications to barter and/or sell that information to Facebook in return for access to the Meta Pixel tool in violation of N.J.S.A. 2A:156A-3(c).

206.    Defendants qualifies as a person under the statute.

207.    All alleged communications between Plaintiff or Class Members and Defendants qualify as wire communications under New Jersey law because each communication is made using personal computing devices (e.g., computers, smartphones, tablets) that send and receive communications in whole or in part through the use of facilities used for the transmission of communications aided by wire, cable, or other like connections.

208.    A "wire communication" under the statute means any communication made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception."

N.J.S.A. 2A:156A-2(a).

209.    Defendants engaged in and continues to engage in interception by aiding others (including Facebook) to secretly record the contents of Plaintiff's and Class Members' wire communications.

210.    The intercepting devices used in this case include, but are not limited to:

a.    Plaintiff and Class Members' personal computing devices;

b.    Plaintiff and Class Members' web browsers;

c. Plaintiff and Class Members' browser-managed files;

d. Facebook's Meta Pixel;

e. Internet cookies;

f. Defendants' computer servers;

g. Third-party source code utilized by Defendants; and

h. Computer servers of third parties (including Facebook) to which Plaintiff and Class Members' communications were disclosed.

211. "Contents" under the statute, "when used with respect to any wire, electronic or oral communication, includes any information concerning the identity of the parties to such communication or the existence, substance, purport, or meaning of that communication."

N.J.S.A. 2A:156A-2(g).

212. Defendants aided in, and continues to aid in, the interception of contents in that the data from the communications between Plaintiff and/or Class Members and Defendants that were redirected to and recorded by the third parties include information which identifies the parties to each communication, their existence, and their contents.

213. Defendants aided in the interception of "contents" in at least the following forms:

a. The parties to the communications;

b. The precise text of patient search queries;

c. Personally identifying information such as patients' IP addresses, Facebook IDs, browser fingerprints, and other unique identifiers;

d. The precise text of patient communications about specific doctors;

e. The precise text of patient communications about specific medical conditions;

52

f.  The precise text of patient communications about specific treatments;

g.  The precise text of patient communications about scheduling appointments with medical providers;

h.  The precise text of patient communications about billing and payment;

i.  The precise text of specific buttons on Defendants' website(s) that patients click to exchange communications, including Log-Ins, Registrations, Requests for Appointments, Search, and other buttons;

j.  The precise dates and times when patients click to Log-In on Defendants' website(s);

k.  The precise dates and times when patients visit Defendants' websites;

l.  Information that is a general summary or informs third parties of the general subject of communications that Defendants sends back to patients in response to search queries and requests for information about specific doctors, conditions, treatments, billing, payment, and other information; and

m.  Any other content that Defendants has aided third parties in scraping from webpages or communication forms at web properties.

214.  Plaintiff and Class Members reasonably expected that their Personal Health Information was not being intercepted, recorded, and disclosed to Facebook and other third parties.

215.  No legitimate commercial purpose was served by Defendants' willful and intentional disclosure of Plaintiff's and Class Members' Private Information to Facebook. Neither Plaintiff nor Class Members consented to the disclosure of their Private Information by Defendants to Facebook and other third parties. Nor could they have

consented, given that Defendants never sought Plaintiff's or Class Members' consent, much less told visitors to its website that their every interaction was being recorded and transmitted to Facebook via the Meta Pixel tool.

216.    Plaintiff's and Class Members' electronic communications were intercepted during transmission, without their consent, for the unlawful and/or wrongful purpose of monetizing their Private Information, including using their sensitive medical information to develop marketing and advertising strategies.

217.    Under the Wiretapping Act, aggrieved persons are entitled to recover actual damages, but "in no case shall a person entitled to recover receive less than the sum of $1,000."

N.J.S.A. 2A:156A-32. Plaintiff is also entitled to such preliminary and other equitable and declaratory relief as may be appropriate as well as reasonable attorney's fees and other litigation costs. N.J.S.A. 2A:156A-32.

218.    In addition to statutory damages, Defendants' breach caused Plaintiff and Class Members the following damages:

a.  Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

b.  Defendants eroded the essential confidential nature of the doctor-patient relationship;

c.  Defendants took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without sharing the benefit of such value;

d.  Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendants' duty to maintain confidentiality; and

e.   Defendants' actions diminished the value of Plaintiff and Class Members' personal information.

219.    Plaintiff and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

### COUNT III
### Breach of Fiduciary Duty of
### Confidentiality
### (On Behalf of Plaintiff and the Class)

220.    Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

221.    Plaintiff brings this claim on behalf of himself and all members of the Class.

222.    All conditions precedent to this action have been performed or occurred.

223.    In *Stempler v. Speidell*, 100 N.J. 368, 375 (1985), the New Jersey Supreme Court held that a duty of confidentiality arises from the physician-patient relationship and that a violation of that duty gives rise to a cause of action sounding in tort.

224.    As medical providers for Plaintiff and Class Members, Defendants owe Plaintiff and Class Members a fiduciary duty of confidentiality in the data and content of communications exchanged between Defendants and Plaintiff or Class Members.

225.    Plaintiff and Class Members who paid money to Defendants reasonably believed and expected that Defendants would use part of those funds to operate its websites free of surreptitious collection and exploitation of communications between the parties. Defendants failed to do so. Plaintiff and Class Members would not have purchased medical services from Defendants if they knew that Defendants would share their Private Information with Facebook without their knowledge or written consent.

226.    Defendants breached its duty of confidentiality by disclosing Private

Information about Plaintiff and Class Members, including their status as patients, the content of their communications, and information about their doctors, potential doctors, conditions, treatments, appointments, search terms, and bill payment.

227.     Defendants' breach caused Plaintiff and Class Members the following damages:

a.     Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

b.     Defendants eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

c.     Defendants took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value;

d.     Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendants' duty to maintain the confidentiality of their Private Information; and

e.     Defendants' actions diminished the value of Plaintiff and Class Members' personal information.

## COUNT IV
### Breach of Implied In Fact Contract
### (On Behalf of Plaintiff and the Class)

228.     Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

229.     Plaintiff brings this claim on behalf of himself and all members of the Class.

230.     Defendants promises in its "Notice of Privacy Practices" that it is committed to protecting patients' medical information, telling patients that "We understand that

information about you and your health is personal" and that "[w]e are committed to protecting such information about you."[74] Defendants also assures patients that it would never sell their Private Information for marketing purposes without their written authorization.

231.    Defendants solicited and invited Plaintiff and Class Members to provide their Private Information on its website as part of Defendants' regular business practices. Plaintiff and Class Members accepted Defendants' offers and provided their Private Information to Defendants as part of acquiring Defendants' medical services.  Per its contractual, legal, ethical, and fiduciary duties, Defendants was obligated to take adequate measures to protect Plaintiff's and Class Members' Private Information from unauthorized disclosure to third parties such as Facebook. These facts give rise to the inference that Defendants took on obligations outside the plain terms of any express contracts that they may have had with Plaintiff and Class Members.

232.    Plaintiff and the Class Members entered into valid and enforceable implied contracts with Defendants when they sought medical treatment from Defendants. Specifically, through their course of conduct, Defendants, Plaintiff, and Class Members entered into implied contracts for the provision of medical care and treatment, which included an implied agreement for Defendants to retain and protect the privacy of Plaintiff's and Class Members' Private Information.

233.    Defendants required and obtained Plaintiff's and Class Members' Private Information as part of the physician-patient relationship, evincing an implicit promise by Defendants to act reasonably to protect the confidentiality of Plaintiff's and Class Members' Private Information. Defendants, through privacy policies, codes of conduct, company

---

[74] https://www.valleyhealth.com/notice-privacy-practices

security practices, and other conduct, implicitly that it would safeguard Plaintiff's and Class Members' Private Information in exchange for access to that information and the opportunity to treat Plaintiff and Class Members.

234.    Implied in the exchange was a promise by Defendants to ensure that the Private Information of Plaintiff and Class Members in its possession would only be used for medical treatment purposes and would not be shared with third parties such as Facebook without the knowledge or consent of Plaintiff and Class Members.    By asking for and obtaining Plaintiff's and Class Members' Personal Health Information, Defendants assented to protecting the confidentiality of that information.    Defendants' implicit agreement to safeguard the confidentiality of Plaintiff's and Class Members' Private Information was necessary to effectuate the contract between the parties.

235.    Plaintiff and Class Members provided their Private Information in reliance on Defendants' implied promise that this information would not be shared with third parties without their consent.

236.    These exchanges constituted an agreement and meeting of the minds between the parties:  Plaintiff and Class Members would provide their Private Information in exchange for the medical treatment and other benefits provided by Defendants (including the protection of their confidential personal and medical information).  A portion of the price of each payment that Plaintiff and the Class Members made to Defendants for medical services was intended to ensure the confidentiality of their Private Information.

237.    In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendants would comply with its promises to  protect  the confidentiality of their Private Information as well as applicable laws and

regulations governing the disclosure of such information and that Defendants would not allow third parties to collect or exploit their communications with Defendants without their consent.

238.    It is clear by these exchanges that the parties intended to enter into an agreement and mutual assent occurred.  Plaintiff and Class Members would not have disclosed their Private Information to Defendants but for the prospect of Defendants' promise of medical treatment and other benefits.  Conversely, Defendants presumably would not have taken Plaintiff and Class Members' Private Information if it did not intend to provide them with medical treatment and other benefits.

239.    Defendants was therefore required to reasonably safeguard and protect the Private Information of Plaintiff and Class Members from unauthorized disclosure and/or use by third parties.

240.    Plaintiff and Class Members accepted Defendants' medical services offer and fully performed their obligations under the implied contract with Defendants by providing their Private Information to Defendants among other obligations.  Plaintiff and Class Members would not have provided and entrusted their Private Information to Defendants in the absence of their implied contracts with Defendants and would have instead retained the opportunity to control their Private Information for uses other than the benefits offered by Defendants.

241.    Plaintiff and Class Members relied on Defendants' implied promises to safeguard their Private Information to their detriment.  Defendants breached the implied contracts with Plaintiff and Class Members by failing to reasonably safeguard and protect Plaintiff's and Class Members' Private Information from disclosure to Facebook and other third parties.

242.    Defendants' failure to implement adequate measures to protect the Private Information of Plaintiff and Class Members and Defendants' intentional disclosure of the

same to Facebook violated the purpose of the agreement between the parties: Plaintiff's and Class Members' provision of money and Private Information in exchange for medical services and other benefits.

243.   Instead of safeguarding Plaintiff's and Class Members' Private Information, Defendants intentionally shared that information with Facebook thereby breaching the implied contracts it had with Plaintiff and Class Members.

244.   Plaintiff and Class Members who paid money to Defendants reasonably believed and expected that Defendants would use part of those funds to operate its websites free of surreptitious collection and exploitation of communications between the parties. Defendants  failed to do so.  Plaintiff and Class Members would not have purchased medical services from Defendants if they knew that Defendants would share their Private Information with Facebook without their knowledge or written consent.

245.   Under the implied contracts, Defendants and/or its affiliated healthcare providers promised and were obligated to: (a) provide healthcare to Plaintiff and Class Members; and

(b) protect Plaintiff and the Class Members' Personal Health Information provided to obtain such healthcare. In exchange, Plaintiff and Class Members agreed to pay money for these services,  and to turn over their Personal Health Information through the use of Defendants' websites.

246.   Both the provision of medical services healthcare and the protection of Plaintiff and Class Members' Private Health Information were material aspects of these implied contracts.

247.   The implied contracts for the provision of medical services—contracts that

include the contractual obligations to maintain the privacy of Plaintiff and Class Members' Private Health Information unless they consent—are also acknowledged, memorialized, and embodied in multiple documents, including (among other documents) Defendants' published Notice of Privacy Practices.

248.    Defendants' express representations, including, but not limited to the express representations found in its Notice of Privacy Practices, memorialize and embody an implied contractual obligation requiring Defendants refrain from aiding or allowing third parties to collect or Plaintiff and Class Members' Private Information without consent.  By soliciting and acquiring Plaintiff's and Class Members' Private Information Defendants assumed an independent duty to handle Plaintiff's and Class Members' Private Information with due care and consistent with industry standards to prevent the foreseeable harm that arises from a breach of that duty.

249.    Consumers of healthcare value their privacy, the privacy of their dependents, and the ability to keep their Private Information associated with obtaining healthcare private. To customers such as Plaintiff and the Class Members, healthcare that allows third parties to secretly collect their Private Information without consent is fundamentally less useful and less valuable than healthcare that refrains from such practices. Plaintiff and Class Members would not have entrusted their Private Information to Defendants and entered into these implied contracts with Defendants without an understanding that their Private Information would be safeguarded and protected or entrusted their Private Information to Defendants  in the absence of its implied promise to do so.

250.    A meeting of the minds occurred when Plaintiff and the Class Members agreed to, and did, provide their Private Information to Defendants and/or its affiliated healthcare

providers, and paid for the provided healthcare in exchange for, amongst other things, (a) the provision of healthcare and medical services and (b) the protection of their Private Information.

251.    Plaintiff and the Class Members performed their obligations under the contract when they paid for their healthcare services and provided their Private Information.

252.    Defendants materially breached its contractual obligation to protect the nonpublic Private Information Defendants gathered when it allowed third parties to collect and exploit that information without Plaintiff's and Class Members' consent.

253.    Defendants also materially breached its contractual obligation to protect Plaintiff's and Class Members' non-public Private Information when it failed to implement adequate security measures and policies to protect the confidentiality of that information. For example, on information and belief, Defendants (1) failed to implement internal policies and procedures prohibiting the disclosure of patients' Private Information without consent to third-party advertising companies like Facebook, (2) failed to implement adequate reviews of the software code and java script installed on its websites to ensure that patients' Private Information was not being automatically routed without consent to third party advertising companies like Facebook, (3) failed to provide adequate notice to the public that visitors to its websites risked having their Private Information shared with third party advertising companies like Facebook, (4) failed to take other industry standard privacy protection measures such as providing a "cookie" acceptance button on its website homepages, (5) failed to provide visitors to its websites with a means to opt out of the automatic transfer of data regarding their website interactions to third party advertising companies like Facebook, (6) failed to implement internal policies and educational programs to ensure that Defendants'

website managers and coders were familiar with the legal regulations governing the disclosure patient Private Information to third parties, and (7) failed to install adequate firewalls or take similar measures to prevent the automatic routing of patients' Private Information to third party advertising companies like Facebook.

254.    As a result of Defendants' failure to fulfill the data privacy protections promised in these contracts, Plaintiff and Class Members did not receive the full benefit of their bargains, and instead received healthcare and other services that were of a diminished value compared to those described in the contracts. Plaintiff and Class Members were therefore damaged in an amount at least equal to the difference in the value of the healthcare services with data privacy they paid for and the healthcare services they received.

255.    As a result of Defendants' material breaches, Plaintiff and Class Members were deprived of the benefit of their bargain with Defendants because they spent more on medical services with Defendants than they would have if they had known that Defendants was not providing the reasonable data security and confidentiality of patient communications that Defendants represented that it was providing in its privacy policies. Defendants' failure to honor its promises that it would protect the confidentiality of patient communications thus resulted in Plaintiff and Class Members overpaying Defendants for the services they received.

256.    The services that Plaintiff and Class Members ultimately received in exchange for the monies paid to Defendants were worth quantifiably less than the services that Defendants promised to provide, which included Defendants' promise that any patient communications with Defendants would be treated as confidential and would never be disclosed to third parties for marketing purposes without the express consent of patients.

257.    The medical services that Defendants offers are available from many other

health care systems who do protect the confidentiality of patient communications.  Had Defendants disclosed that it would allow third parties to secretly collect Plaintiff and Class Members' Private Health Information without consent, neither the Plaintiff, the Class Members, nor any reasonable person would have purchased healthcare from Defendants and/or its affiliated healthcare providers.

258.    Defendants' conduct in sharing Plaintiff's and Class Members' Personal Health Information with Facebook also diminished the sales value of that information.  There is a robust market for the type of information that Plaintiff and Class Members shared with Defendants (which Defendants then shared with Facebook).  Indeed, Facebook itself has offered to pay the public to acquire similar information in the past so that Facebook could use such information for marketing purposes.  Plaintiff and Class Members were harmed both by the dissemination of their Private Information and by losing the sales value of that information.

259.    As a direct and proximate result of these failures, Plaintiff and the Class Members have been harmed and have suffered, and will continue to suffer, actual damages and injuries, including, without limitation, the release and disclosure of their Private Information, the loss of control of their Private Information, the diminution in value of their Private  Information, and the loss of the benefit of the bargain they had struck with Defendants.

260.    Plaintiff and the Class Members are entitled to compensatory and consequential damages suffered as a result.

261.    Plaintiff and Class Members also face a real and immediate threat of future injury to the confidentiality of their Personal Health information both because such

information remains within Defendants' control and because anytime that Plaintiff and/or Class Members interact with Defendants' websites to make appointments, such information about their medical conditions, search for a doctor, or otherwise seek assistance with their medical conditions they risk further disclosure of their Private Information. Plaintiff and the Class Members are therefore also entitled to injunctive relief requiring Defendants to cease all website operations that allow for the third-party capture of Private Information.

**COUNT V**
**Unjust Enrichment/Quasi-**
**Contract**
**(On Behalf of Plaintiff and the**
**Class)**

262.    Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

263.    Plaintiff hereby pleads this Count in the alternative to Count III.

264.    Plaintiff brings this claim on behalf of himself and all members of the Class.

265.    Plaintiff and Class Members conferred a benefit on Defendants in the form of valuable sensitive medical information that Defendants collected from Plaintiff and Class Members under the guise of keeping this information private. Defendants collected, used, and disclosed this information for its own gain, including for advertisement purposes, sale, or trade for valuable services from third parties. Additionally, Plaintiff and the Class Members conferred a benefit on Defendants in the form of monetary compensation.

266.    Plaintiff and the Class Members would not have used the Defendants' services, or would have paid less for those services, if they had known that Defendants would collect, use, and disclose this information to third parties.

267.    Defendants unjustly retained those benefits at the expense of Plaintiff and

Class Members because Defendants' conduct damaged Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff and Class Members.

268.    The benefits that Defendants derived from Plaintiff and Class Members rightly belong to Plaintiff and Class Members.  It would be inequitable under unjust enrichment principles for Defendants to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

269.    Plaintiff and Class members have no adequate remedy at law.

270.    Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds that Defendants received, and such other relief as the Court may deem just and proper.

**COUNT VI**
**Invasion of Privacy—Unreasonable Intrusion**
**upon the Seclusion of Another**
**(On Behalf of Plaintiff and the Class)**

271.    Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

272.    Plaintiff brings this claim on behalf of himself and all members of the Class.

273.    Defendants promises in its "Notice of Privacy Practices" that it is committed to protecting patients' medical information, telling patients that "We understand that information about you and your health is personal" and that "[w]e are committed to protecting such information about you."  Defendants also promises patients that it will never use or disclose "your protected health information for marketing purposes" without "your written permission." Defendants also promises that it will never make "disclosures that constitute a

sale of your protected health information" without "your written permission."[75]

274.    These promises by Defendants, coupled with Defendants' legal obligations to protect the confidentiality of patient Private Information, were sufficient to create an expectation of privacy by Plaintiff and Class Members that their Private Information would not be disclosed to third party marketing companies like Facebook without their written permission.  In these circumstances, a reasonable person could deem Defendants' deceit and disregard for its patient's privacy interests as both highly offensive and an egregious breach of social norms.

275.    Plaintiff and Class Members had a legitimate and reasonable expectation of privacy with respect to their Personal Health Information and were accordingly entitled to protection of this information against the acquisition and disclosure of their Private Information by unreasonable means.

276.    Defendants owed a duty to Plaintiff and Class Members to protect the confidentiality of their Private Information and not to share such information with Facebook for marketing purposes without the express written consent of Plaintiff and Class Members.

277.    Defendants obtained Plaintiff's and Class Members' Private Information by falsely promising that it would safeguard the confidentiality of that information and that it would never disclose such information to third parties for marketing purposes without written consent. The deceitful method through which Defendants obtained Plaintiff's and Class Member's Private Information (i.e., lying to patients about how their Private Information would be used) would be objectionable to a reasonable person.

---

[75] https://www.valleyhealth.com/notice-privacy-practices

278.    Neither Plaintiff nor Class Members authorized or consented to Defendants sharing their Private  Information with Facebook, and Defendants' decision to do so nevertheless violated both Defendants' express promises and its legal obligations to protect the confidentiality of its patients' Private Information.

279.    In these circumstances, the unauthorized acquisition, appropriation, and disclosure of Plaintiff's and Class Members' Private Information would be highly offensive to a reasonable person.  Defendants' promises that it would never disclose patients' protected health information for marketing purposes without their written consent was sufficient to create a reasonable expectation of privacy with respect to Plaintiff's and Class Members' engagement with Defendants' websites.

280.    The intrusion was into subject matter that was private and is entitled to be private. Plaintiff and Class Members disclosed their Private Information to Defendants with the understanding that it would only be used for their medical treatment and that such information would be kept confidential and protected from disclosure to third parties.  Plaintiff and Class Members reasonably believed that such information would be kept private and would not be shared with Facebook without their authorization so that Facebook could target them with advertising.

281.    The disclosure of Plaintiff's and Class Members' Personal Health Information by Defendants constitutes an unreasonable intrusion upon Plaintiff's and Class Members' seclusion, as to both their persons, their private affairs, and private concerns of a kind that would be highly offensive to a reasonable person.

282.    Defendants acted with a knowing mind when it intentionally disclosed Plaintiff and Class Members' Private Information to Facebook.  Defendants further invaded

Plaintiff's and Class Members' privacy by failing to implement adequate data security measures, despite its obligations to protect patients' Private Information.

283. Acting with knowledge, Defendants had notice and knew that its disclosure of Plaintiff's and Class Members' Private Information would cause injury to Plaintiff and Class Members.

284. As a proximate result of Defendants' acts and omissions, Plaintiff's and Class Members' Private Information was transmitted to Facebook and other third parties without authorization, causing Plaintiff and Class Members to suffer injury, including, at minimum, the following damages:

    a.    Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

    b.    Defendants eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

    c.    Defendants took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value;

    d.    Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendants' duty to maintain the confidentiality of their Private Information; and

    e.    Defendants' actions diminished the value of Plaintiff and Class Members' Private Information.

285. Unless and until enjoined and restrained by order of this Court, Defendants' wrongful conduct will continue to cause great and irreparable injury to Plaintiff and Class

Members in that their Private Information can be accessed, acquired by, appropriated by, disclosed to, used by, and/or viewed by unauthorized third parties.

286.    Plaintiff and Class Members have no adequate remedy at law for the injuries that they have suffered (and will continue to suffer) because of Defendants' wrongful practices in that a judgment for money damages will not end the invasion of privacy for Plaintiff and Class Members.  Accordingly, Plaintiff and Class Members seek such injunctive relief as the Court deems legal, equitable, and proper.

**COUNT VII**
**Breach of the Covenant of Good Faith**
**and Fair Dealing**
**(On Behalf of Plaintiff and the Class)**

287.    Plaintiff re-alleges and incorporates by reference all paragraphs above is if fully set forth herein.

288.    Plaintiff brings this claim on behalf of himself and all members of the Class.

289.    As described above, when Plaintiff and Class Members provided their Private Information to Defendants, they entered into implied contracts in which Defendants agreed to comply with its statutory and common law duties to protect their Private Information from disclosure to unauthorized third parties and to timely notify them in the event of a data breach.

290.    These exchanges constituted an agreement between the parties:  Plaintiff and Class Members were required to provide their Private Information in exchange for medical services and other benefits provided by Defendants. These agreements were made by Plaintiff and Class Members in the course of their medical treatment by Defendants.

291.    It was clear by these exchanges that the parties intended to enter into an agreement.  Plaintiff and Class Members would not have disclosed their Private Information to Defendants but for Defendants' promise that it would provide medical services and would

also protect the confidentiality of the Private Information that Plaintiff and Class Members provided during the course of their treatment. Conversely, Defendants presumably would not have taken Plaintiff's and Class Members' Private Information if it did not intend to provide Plaintiff and Class Members medical services and other benefits.

292.    Implied in these exchanges was a promise by Defendants to ensure that the Private Information of Plaintiff and Class Members in its possession was only used to provide medical services.

293.    Defendants' failure to implement adequate security measures to protect the Private Information of Plaintiff and Class Members constituted a denial of Plaintiff's and Class Members' expected benefit of the contract between the parties.

294.    Both Defendants' disclosure of Plaintiff's and Class Members' Private Information and Defendants' lack of diligence with regard to its implementation of adequate security measures to protect the Private Information of Plaintiff and Class Members constituted a denial of Plaintiff's and Class Members' expected benefit of the contract between the parties and evaded the spirit of the transaction between the parties. Defendants did not just breach the contract by this misconduct—Defendants frustrated its essential purpose by intentionally sharing confidential Private Information with Facebook without notice to or consent of Plaintiff and Class Members.

295.    Defendants acted in bad faith by intentionally and unreasonably disclosing Plaintiff's and Class Members' Private Information to Facebook despite having promised that it would never disclose such information without express written authorization from patients. In doing so, Defendants frustrated the rights and reasonable expectations of Plaintiff and Class Members to receive the benefit of the implied agreements that they made with Defendants.

Defendants' intentional disclosure of Plaintiff's and Class Members' sensitive personal and medical information to Facebook was neither honest nor faithful to the agreed purposes of the contract, which included Defendants' promise to protect the confidentiality of Plaintiff's and Class Members' Private Information.

296.    Defendants further performed in bad faith by exercising its discretion in a manner not contemplated by parties.  Specifically, Defendants' conduct in failing to institute reasonable data security measures and policies demonstrates both a lack of diligence and a willful rendering of imperfect performance.  So too, Defendants' decision to install the Meta Pixel tool on its website, with the knowledge that patients' sensitive personal and medical information would be automatically sent to Facebook, also demonstrates not just a willful rendering of imperfect performance but an intentional, bad faith breach of Defendants' obligations to Plaintiff and Class Members.

297.     Plaintiff and Class Members did not receive the benefit of the bargain with Defendants because their provision of Private Information was made in exchange for Defendants' implied agreement to keep that information confidential.

298.    While Defendants had discretion in the specifics of how it met the applicable laws and industry standards governing Private Information, this discretion was governed by an implied covenant of good faith and fair dealing.

299.    Defendants breached this implied covenant when it engaged in acts and/or omissions that are declared unlawful. These acts and omissions included (1) disclosing Plaintiff's and Class Members' Private Information to Facebook without the knowledge or consent of Plaintiff and Class Members; (2) omitting, suppressing, and concealing the inadequacy of the privacy and security protections for Plaintiff's and Class Members' Private

Information; (3) intentionally misleading Plaintiff and Class Members' about how their Private Information would be shared with and used by third party marketing companies like Facebook; (4) failing to disclose to Plaintiff and Class Members that Defendants had installed the Meta Pixel tool on its website; and (5) failing to disclose to Plaintiff and Class Members at the time they provided their Private Information to Defendants that Defendants' data security systems, including training, auditing, and implementation of data security policies failed to meet applicable legal and industry standards.

300. Plaintiff and Class Members did all or substantially all the significant things that the contract required them to do.

301. Likewise, all conditions required for Defendants' performance were met.

302. Defendants' acts and omissions unfairly interfered with Plaintiff's and Class Members' rights to receive full benefits of their contracts.

303. Plaintiff and Class Members have been harmed by Defendants' breach of the implied covenant of good faith and fair dealing in multiple ways, including at minimum, the following damages:

a. Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

b. Defendants eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

c. Defendants took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value;

d. Plaintiff and Class Members did not get the full value of the medical services

for which they paid, which included Defendants' duty to maintain the confidentiality of their Personal Health Information; and

e.    Defendants' actions diminished the value of Plaintiff and Class Members' personal information.

304.    Defendants is liable for this breach of these implied covenants whether or not it is found to have breached any specific express contractual term.

305.    Plaintiff and Class Members are entitled to damages, including compensatory damages and restitution, injunctive relief, attorney's fees, costs, and expenses in amounts to be determined at trial.

**COUNT VIII**
**Bailment**
**(On Behalf of Plaintiff and the Class)**

306.    Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

307.    Plaintiff brings this claim on behalf of himself and all Class Members.

308.    Plaintiff and Class Members entrusted their Private Information to Defendants for the purpose of obtaining medical services.

309.    Plaintiff and Class Members owned the Private Information that they entrusted to Defendants' care. Plaintiff and Class Members agreed to entrust their Private Information into Defendants' care for an agreed price. The bargain between Plaintiff and Class Members and Defendants included an obligation that Defendants safeguard and protect the Private Information provided by Plaintiff and Class Members.

310.    Defendants had knowledge that Plaintiff and Class Members were providing it with Private Information through their interactions with Defendants' websites. By

74

soliciting and acquiring Plaintiff's and Class Members' Private Information Defendants assumed an independent duty to handle Plaintiff's and Class Members' Private Information with due care and consistent with industry standards to prevent the foreseeable harm that arises from a breach of that duty.

311.    Defendants wrongfully retained and failed to safeguard and protect the Private Information provided by Plaintiff and Class Members by knowingly and intentionally sharing that information with Facebook and other third parties. Defendants' wrongful actions, including its failure to safeguard Plaintiff's and Class Members' Private Information, resulted in injury to Plaintiff and Class Members because their Private Information is now in the hands of unauthorized persons and has thus been compromised.

312.    During the time of bailment, Defendants owed Plaintiff and Class Members the duty to safeguard and protect their Private Information by maintaining reasonable and effective data security practices, procedures, and protocols to protect their Private Information. Defendants further breached its obligations to Plaintiff and Class Members by intentionally disclosing their Private Information to Facebook, which, in turn, caused  the wrongful dissemination of this information to unauthorized persons.

313.    Defendants' breach of its duty to safeguard and protect Plaintiff's and Class Members' Private Information directly caused, at minimum, the following damages:

a.    Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

b.    Defendants eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

c.    Defendants took something of value from Plaintiff and Class Members and

derived benefit therefrom without Plaintiff and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value;

d.      Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendants' duty to maintain the confidentiality of their Private Information; and

e.      Defendants' actions diminished the value of Plaintiff and Class Members' personal information.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, respectfully requests that the Court award the following on all counts:

a.      For an order certifying this action as a Class action and appointing Plaintiff and his Counsel to represent the Class;

b.      For equitable relief enjoining the Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff and Class Members' PII, and from refusing to issue prompt, complete, and accurate disclosures to Plaintiff and Class Members;

c.      For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendants' wrongful conduct.

d.      For an award to Plaintiff and members of the New Jersey Subclass statutory damages of $1,000 per Plaintiff and Class Members pursuant to N.J.S.A. 2A:156A-32(c);

e.      To award Plaintiff and Class Members statutory, actual, compensatory, consequential, and nominal damages, in an amount to be determined, as allowable by law;

f.      For an award of punitive damages, as allowable by law;

g.      Awarding Plaintiff and Class Members pre-judgment and post-judgment

interest as provided by law;

h.    Awarding Plaintiff and Class Members reasonable attorney's fees, costs, and expenses;

i.    Awarding costs of suit; and

j.    Such other and further relief to which Plaintiff and Class Members may be entitled.


Dated:  January 25, 2023            Respectfully Submitted:

*/s/ Kevin Laukaitis*
Kevin Laukaitis (NJ Bar # 155742022)
**LAUKAITIS LAW FIRM LLC**
737 Bainbridge Street #155
Philadelphia, PA 19147
Phone: (215) 789-4462
Email: klaukaitis@laukaitislaw.com

Gary M. Klinger (pro hac vice forthcoming)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
227 W. Monroe Street,
Suite 2100
Chicago, IL 60606
Phone: (866) 252-0878
Email: gklinger@milberg.com

*Attorneys for Plaintiff*
*and the Proposed Class*